UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| YA II PN, LTD., | : | |
| Plaintiff, | : | Case No. 1:26-cv-06569 |
| -against- | : | **COMPLAINT** |
| | : | **DEMAND FOR JURY TRIAL** |
| TRILLER GROUP, INC. f/k/a AGBA GROUP HOLDING LIMITED; WING-FAI NG; ROBERT DIAMOND, JR.; and RICHARD TSAI MING HSING, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff YA II PN, Ltd. ("Yorkville"), by and through its undersigned counsel, respectfully submits this complaint against defendant Triller Group, Inc. f/k/a AGBA Group Holding Limited ("Triller Group") and individual defendants Wing-Fai Ng, Robert Diamond, Jr., and Richard Tsai Ming Hsing (the "Individual Defendants," and together with Triller Group, "Defendants") and alleges the following in support thereof based on personal knowledge as to Yorkville's own acts and upon information and belief as to all other matters. Yorkville's information and belief are based upon the investigation of its counsel, including but not limited to review of filings with the United States Securities and Exchange Commission (the "SEC"), Triller Group's public statements and investor presentations, communications between the parties, internal Triller Group documents obtained in the course of the parties' dealings, and consultations with persons having knowledge of the matters alleged herein. Yorkville believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## PRELIMINARY STATEMENT

1.      This action arises from Defendants' fraudulent scheme to induce Yorkville to invest over $33.5 million in AGBA Group Holding Ltd. ("AGBA"), a Nasdaq-listed company, in June 2024 on the basis of materially false and misleading representations concerning its then-anticipated merger with Triller Corp., a social media company whose valuation depended heavily on the quality and size of its user base.

2.      As detailed below, Defendants knowingly, or at least recklessly, presented grossly inflated and misleading metrics concerning Triller Corp.'s user base to Yorkville—the accuracy of which Yorkville was fraudulently led to believe Defendants had confirmed during merger due diligence—to convince Yorkville that the value of the merged companies (which would later become Triller Group upon the closing of the merger in October 2024) was measured in *billions* of dollars.   That outsized valuation, in turn, persuaded Yorkville that AGBA was a worthy investment risk.   Defendants further induced Yorkville's investment by falsely representing that individual Defendant, Richard Tsai, had firmly committed to anchor a $500 million Rule 144A offering through a $100 million investment from his personal family office.   This was critical to Yorkville's investment decision because Triller needed to be capitalized in order to be able to fully fund its operations.

3.      On the basis of AGBA's materially false and misleading representations on which Yorkville reasonably relied, Yorkville made more than $33.5 million in cash advances to AGBA in 2024 to fund its business operations while the anticipated merger with Triller Corp. remained pending.   AGBA's obligation to repay those cash advances was memorialized in an Amended and Restated Secured Convertible Promissory Note dated June 28, 2024 (the "Note").   Among other things, the Note grants Yorkville the right to convert the principal balance under the Note into common stock of the combined company after the merger closing.   The terms of the Note

governing Yorkville's right to convert principal to common stock were heavily negotiated and were based in substantial part on Defendants' representations and omissions concerning the quality and size of Triller Corp.'s user base, as those representations and omissions were embedded in the inflated post-merger valuation of the combined company.

4.    Before Yorkville's investment, Defendants falsely represented to Yorkville that the Triller app had over *450 million* consumer accounts and, on the basis of that knowingly inflated figure, that the post-merger valuation of the combined company was $4 billion.  In reality, but unbeknownst to Yorkville at the time, the Triller app's true number of monthly active users was actually a fraction of the 450 million consumer account figure.

5.    Defendants knew that the user metrics reported to Yorkville were grossly inflated. Upon information and belief, Defendants learned during pre-closing merger due diligence that Triller Corp. was actively purchasing fictitious "bot accounts" and knowingly permitting millions of such accounts to remain on the platform.  These practices artificially inflated Triller Corp.'s reported user metrics and valuation, which was fundamentally tied to user volume and engagement.  Defendants presented the fabricated figures to induce Yorkville's investment.  And in an effort to cover their tracks, Defendants caused risk disclosures to be disseminated to Yorkville and the investing public that misleadingly warned that Triller Corp.'s user metrics might not be completely precise, while materially omitting any mention of Triller Corp.'s intentional purchase of bot accounts to artificially inflate its user numbers.

6.    By the time Yorkville learned the truth, it was already too late to salvage its investment.  Upon the closing of the merger on October 15, 2024, AGBA changed its name to Triller Group and began trading on Nasdaq under the stock ticker ILLR and, not long thereafter, Triller Group's stock price was in free-fall.  The $4 billion valuation, along with the user metrics

underlying it, was entirely an illusion—as Yorkville learned not even a month after the merger closing.

7.       On November 14, 2024, a Triller Group employee confidentially approached Yorkville to present information showing beyond any doubt that the company's user metrics were falsely inflated by its use of "bot farms," and the Individual Defendants knew it all along. After having specifically raised questions with Mr. Diamond and Mr. Ng concerning Triller Corp.'s reported user figures prior to Yorkville's investment and receiving reassurances that the figures were legitimate, Yorkville was shocked to learn that the figures were wholly illegitimate.

8.       Since learning of the fraudulent manipulation of Triller Corp.'s user metrics, Yorkville has tried to recover its significant investment in Triller Group/AGBA, to no avail. The same day that it learned of the fraud, Yorkville delivered notice to Triller Group of multiple Events of Default under the Note and demanded repayment in full. Triller Group did not dispute the defaults but failed to pay. On November 26, 2024, Yorkville filed a lawsuit in the Supreme Court of New York, New York County to recover the amounts owed under the Note and related guarantees (the "Payment Action").[1] That action remains pending and, to date, Triller Group has failed and refused to repay a single dime of the more than $33.5 million in cash advances that it (through its predecessor, AGBA) obtained from Yorkville under false pretenses. Triller Group has also failed to honor any of the conversion notices that Yorkville has validly delivered under the Note.

9.       In this separate action, Yorkville seeks to vindicate its rights and hold Defendants accountable for their fraudulent and unlawful conduct under the federal securities laws. The Note

---

[1] The Payment Action is styled *YA II PN, Ltd. v. Triller Group, Inc., et al.,* Index No. 659314/2024 (N.Y. Sup. Ct., N.Y. Cnty.).

4

is a "security" under the Securities Exchange Act of 1934 (the "Exchange Act"), *see* 15 U.S.C. § 78c(a)(10), and Yorkville's payment of advances under the Note constitutes the purchase of a security subject to the antifraud provisions of the Exchange Act, including sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a). *See* 15 U.S.C. §§ 78j(b), 78t(a); 17 C.F.R. § 240.10b-5. Defendants' scheme to defraud Yorkville, through both their material misrepresentations and omissions about Triller Corp.'s user base and the undisclosed scheme to cover up those falsehoods through the use of bot farms, as well as their repeated fraudulent misrepresentations that Triller had secured a $100 million in investment from Mr. Tsai to fund future operations, are blatant violations of those provisions.

10.    In addition, Yorkville seeks this Court's immediate intervention to require Triller Group to honor its obligations under the Note with respect to Yorkville's June 25, 2026 notice requesting the issuance of 32,569 shares of Triller Group common stock to convert $25,000 of the outstanding principal amount of the Note (the "June 25 Conversion Notice"). None of the limitations on conversions set forth in Section 3(c) of the Note applied to the June 25 Conversion Notice. In direct violation of the terms of the Note, Triller Group has ignored the June 25 Conversion Notice and has refused to deliver paperwork—an opinion from its counsel confirming that the contemplated share issuance, and any subsequent sale of those shares, would comply with the requirements of SEC Rule 144 (17 C.F.R. § 230.144) (the "Rule 144 Opinion")—that Triller Group's transfer agent requires in order to effectuate issuance of the requested shares to Yorkville.

11.    As detailed below, Triller Group's financial condition is dire and rapidly deteriorating further. Triller Group's Form 10-Q filed with the SEC on November 14, 2024, signed by Mr. Ng on behalf of Triller Group, disclosed that "the prevailing conditions and ongoing liquidity risks encountered by [Triller Group] raise substantial doubt about the ability to continue

as a going concern for at least one year." Triller Group further "reported net loss of $28,849,026" for the first nine months of 2024, as well as a working capital deficit of over $40 million. In its annual report for 2025, signed by Mr. Ng and filed with the SEC on Form 10-K on April 14, 2026, Triller Group's auditors express "substantial doubt about [its] ability to continue as a going concern for a period of twelve months." On February 17, 2026, Triller Group filed an amended Form 10-Q with the SEC, signed by Mr. Ng, disclosing that "currently available cash will not be able to provide sufficient funds to meet the planned obligations for the next 12 months," with a cash balance as of March 31, 2025 of only $2.1 million for working capital use. Further, the company's stock was delisted and suspended from trading by Nasdaq in December 2025, only having had its listing restored on or about April 15, 2026. But Nasdaq issued another delisting notice just two days later, on April 17, 2026, because the stock price had been below the required $1.00 minimum bid price since at least the summer of 2025. Since then, the company has only been able to maintain Nasdaq's required $1.00 minimum bid price through a 1-for-10 reverse stock split effectuated on or about June 25, 2026. As of July 29, 2026, the closing price of Triller Group's common stock stood at just $1.13 per share, implying a market capitalization of approximately ***$20 million***, just ***one-half of one percent*** of the represented value of the company just two years ago.

12.    Further, Triller Group has been the subject of multiple litigations in which it has defaulted—including the New York Supreme Court action brought by Yorkville, in which its counsel has twice withdrawn its representation due to Triller Group's failure to pay counsel's fees, causing repeated substitutions, missed appearances, and stalled proceedings. Triller Group also has defaulted in an action in the Delaware Court of Chancery seeking a judgment totaling hundreds of millions of dollars arising out of Triller Group's alleged breaches of the merger agreement

underlying the AGBA-Triller Corp. merger. Music industry sources report that Triller Group owes approximately $30 million to various record labels, music publishers, and performing rights organizations, and at least one of those lawsuits appears to have recently resulted in a $3.2 million judgment. A lawsuit filed in April 2026 alleges that Triller Group has abandoned its wholly owned subsidiary, Flipps Media, Inc. ("Flipps"), which runs TrillerTV, including by refusing to provide funding necessary to prevent its insolvency. *See Flipps Media, Inc. v. Triller Hold Co LLC*, No. 2026-0483 (Del. Ch.) (the "Flipps Action"). The Flipps directors all resigned in or about October 2024, and Triller Group allegedly abandoned Flipps by failing to nominate replacements or convene a stockholder meeting, forcing Flipps to obtain high-cost emergency debt facilities that led to insolvency. And according to public reporting, Triller Group stopped paying its employees at least one year ago. To be clear, Triller did not terminate or lay off its employees. Triller simply "ghosted" them. Employees simply stopped getting paid and their health insurance was cancelled without any notice or communication. In or around late 2025, Triller Group also abandoned its keystone Triller social media app entirely, because it was generating zero revenue. These are just some of the numerous data points showing that Triller Group's business is nearing total collapse.

13.    Given Triller Group's grave and worsening financial condition, a temporary restraining order directing Triller Group to immediately issue the Rule 144 Opinion to its transfer agent is needed to prevent irreparable harm to Yorkville's conversion rights under the Note and its rights as a Triller Group stockholder.

14.    In addition, Yorkville respectfully requests a preliminary injunction ordering Triller Group: (i) to instruct its transfer agent, following issuance of the Rule 144 Opinion, to issue the shares requested in the June 25 Conversion Notice; and (ii) to comply with its obligations under the Note with respect to any future conversion notices validly delivered by Yorkville. The

7

requested injunctive relief is necessary to ensure the timely conversion of principal under the Note to common stock and to otherwise preserve and protect Yorkville's valuable legal rights.

## **PARTIES**

15.    Plaintiff Yorkville is a Cayman Islands limited company with its principal place of business located at 1012 Springfield Avenue, Mountainside, New Jersey 07092.

16.    Triller Group is a Delaware corporation that purports to maintain its US headquarters at 7119 West Sunset Boulevard, Suite 782, Los Angeles, California 90046, and also maintains offices at AGBA Tower, 68 Johnston Road, Wan Chai, Hong Kong.  Triller Group's common stock trades on the Nasdaq under the symbol "ILLR."

17.    Defendant Wing-Fai Ng is the current Chief Executive Officer and Executive Director of Triller Group, having served in those roles since the closing of the merger of AGBA and Triller Corp. in October 2024.  Before the closing of the merger, Mr. Ng was CEO of AGBA, a role in which he served beginning in November 2022.  Upon information and belief, Mr. Ng resides in Alhambra, California.

18.    Defendant Robert Diamond Jr. was appointed Chairman of the Board of Directors of AGBA in or about September 2023 and, following the closing of the AGBA-Triller Corp. merger, served as Chairman of Triller Group until his resignation on or about December 12, 2024. Upon information and belief, Mr. Diamond resides in New York, New York.

19.    Defendant Richard Tsai Ming Hsing is Triller Group's controlling stockholder through various investment vehicles under his ownership control.  Mr. Tsai beneficially owns and controls Eagle Legacy Limited, Oceana Glory Limited, Green Nature Limited, Total Formation Inc., Castle Lion Investments Ltd., and Fubon Financial Holding Venture Capital Co., Ltd. ("Fubon").  Upon information and belief, through one or more of these entities, Mr. Tsai holds a controlling equity interest in Triller Group sufficient to direct the management and policies of the

company.  For example, after the closing of the merger, Mr. Tsai held Series B Preferred Stock in Triller Group through Green Nature Limited representing approximately 65% of the total voting power.  Upon information and belief, Mr. Tsai has exercised control over Triller Group by, among other things, directing key strategic and financial decisions of Triller Group, approving the merger transaction and the terms of the Note, and authorizing or ratifying the dissemination of false user metrics to Yorkville and the investing public.  Alternatively, Mr. Tsai has acted as a *de facto* director of Triller Group.  Mr. Tsai also beneficially owns Convoy Global Holdings Limited ("Convoy"), which executed an unconditional Guaranty of Triller Group's obligations under the Note and defaulted on that Guaranty.  Upon information and belief, Mr. Tsai resides in Hong Kong, China.

## **JURISDICTION AND VENUE**

20.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1367 because Yorkville asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a) (and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5), and Yorkville's state-law claims arising out of the Note are so related to Yorkville's Exchange Act claims that they form part of the same case or controversy under Article III of the United States Constitution.  Under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, the Court's jurisdiction over Yorkville's Exchange Act claims is "exclusive."

21.    Defendants are subject to the personal jurisdiction of this Court under Section 27 of the Exchange Act.  Section 27 provides for nationwide service of process, thereby conferring personal jurisdiction over all Defendants, each of whom has sufficient minimum contacts with the United States as a whole.  The Court separately has personal jurisdiction over Defendant Triller Group for purposes of the state-law claims arising out of the Note because Triller Group

"irrevocably consent[ed] to" personal jurisdiction in New York under Section 10(b) of the Note. Exh. 1, Note § (10)(b)(i)-(ii).[2]

22.    Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  In addition, Triller Group's common stock is listed and traded on the Nasdaq, which is based in this District, and Mr. Diamond is located in this District.  Venue is independently proper with respect to Yorkville's state-law claims arising under the Note because Triller Group "agree[d] that venue shall be proper in any court of" New York under Section 10(b) of the Note, and because a substantial part of the events giving rise to the claim occurred in this District.  Exh. 1, Note § (10)(b)(i)-(ii).

23.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## FACTUAL ALLEGATIONS

**A.    The Central Importance of Attracting Real Users to Triller Corp.'s Platform to the Success of Its Business Model**

24.    Founded in 2015, Triller Corp. launched the Triller app as a music-focused social media application distinguishing itself with high-quality short form content similar to TikTok. From early on in its operations, Triller Corp. touted and focused on its ability to attract and retain users on its app—a matter of critical importance to any up-and-coming social media company— and framed its user metrics as a key indicator of the success of its business model.

---

[2] Citations to "Exh. __" refer to the exhibits attached to the Complaint.

25.     In August 2020, for example, Triller Corp. promoted itself as a rival and alternative to TikTok, with a Triller spokesperson noting that the Triller app "has been downloaded more than 250 million times worldwide and has roughly 65 million active users."[3]  And just a month later in September 2020, Triller Corp.'s then-CEO publicly stated at TechCrunch Disrupt that Triller Corp. was "a true exponential curve in terms of our usage, in terms of our growth, and we don't see that slowing down anytime soon."

26.     Ultimately, the reported growth in Triller Corp.'s user base attracted new investors, and Triller Corp. sought to undertake an initial public offering ("IPO") of its common stock.  In furtherance of that effort, Triller Corp. filed a registration statement with the SEC on Form S-1 on August 2, 2023.  In that initial registration statement, Triller Corp. touted the "more than 550 million user accounts . . . . across our offerings."  8/2/23 Triller Corp. S-1 at 130.

27.     In preparation for the IPO, Triller Corp. engaged in discussions with Yorkville about a potential equity investment.  On or about October 23, 2023, Triller Corp.—which was still a private company at the time—and Yorkville entered into a Standby Equity Purchase Agreement (the "Original SEPA"), under which Triller Corp. received the right to issue and sell up to $500 million of common stock to Yorkville from time to time, once it was public.  Yorkville ultimately did not purchase any Triller Corp. common stock under the Original SEPA because, as explained below, Triller Corp. pivoted to pursuing a business combination with AGBA, whose stock already was publicly traded on Nasdaq and therefore could unlock access to the US public capital markets that Triller Corp. sought.

---

[3]  *See*  https://www.cnbc.com/2020/08/07/triller-on-being-tiktoks-rival-we-see-ourselves-as-the-adult-version.html?msockid=22df8b6d08c26f5530769d7909d06ed5.

28.     On or about January 12, 2024, Triller Corp. filed an amended registration statement with the SEC on Form S-1 that contained various cautionary statements about its user and account metrics, noting that the company did "not currently have procedures or processes in place to accurately estimate the number of bots or spammers on our Technology Platform, but are actively working to prevent bots and spammers from engaging on our platform."  Triller Corp., 1/12/24 Triller Corp. S-1/A at 39.  Rather than serve as a warning, however, this statement was carefully framed to reassure investors.  Triller Corp. touted its purported remedial efforts as a signal to investors that the company was responsibly addressing a common industry challenge rather than concealing a fraudulent scheme to inflate its reported figures.

29.     In the same filing, Triller Corp. acknowledged that fictitious bot, duplicative, and other accounts could cause user metrics to be artificially inflated but claimed that the company was taking a "proactive" and "uncommon" approach to addressing the issue. *Id.* at 1.  Triller Corp. disclosed that it "recently undertook a robust process to purge as many of the duplicate and bot accounts as practicable with our resources and in doing so we purged in excess of 200 million Consumer Accounts from our total user accounts metric, leading us to a current net Consumer Accounts number of 327 million on the Triller app, with a total of 433 million Consumer Accounts on our Technology Platform." *Id.*  These disclosures were designed to convey that Triller Corp. had identified and was actively remediating the issue, not that its metrics remained fundamentally unreliable, and certainly not that Triller Corp. was actively ***purchasing*** bots to inflate its metrics.

**B.     Triller Corp. and AGBA Fraudulently Induce Yorkville to Invest More Than $33.5 Million on the Basis of Fraudulent User Metrics**

30.     Ultimately, Triller Corp. elected not to move forward with an IPO on its own and instead pivoted towards a potential business combination with AGBA, which already enjoyed access to the US public capital markets by way of its listing on Nasdaq.  Because Yorkville's

purchase of shares of Triller Corp.'s common stock under the Original SEPA was conditioned on their registration with the SEC, Yorkville did not acquire any Triller Corp. common stock or otherwise invest in Triller Corp. pursuant to that agreement.

31.    On or about April 18, 2024, AGBA filed a current report with the SEC on Form 8-K announcing its intent to effectuate a merger with Triller Corp., pursuant to an Agreement and Plan of Merger dated as of April 16, 2024 (as subsequently amended and restated, the "Merger Agreement").  The Form 8-K included as an attachment an investor presentation with impressive financial and usage figures (the "Investor Presentation"), including that the Triller app had over *450 million* consumer accounts.  Exh. 2, Investor Presentation at 4.  Based on these figures, AGBA assigned a valuation of *$4 billion* to the combined company.  *Id.* at 11.

32.    In response to this news, AGBA's stock price spiked dramatically, rising from a closing price of $21.28 on April 18, 2024, to a closing price of *$61.36* by April 23, 2024—a gain of nearly *200 percent*.  The stock continued to trade at similarly inflated prices through the end of June 2024.

33.    AGBA's representations about the number of consumer accounts on the Triller app were material, as AGBA would later confirm in a preliminary proxy statement filed with the SEC on August 1, 2024 in stating that "[t]he total number of Consumer Accounts across our Technology Platform provides insight into the popularity and utility of our offerings and is an *important metric* for our business."  AGBA 8/1/24 Prelim. Proxy Stmt. at 198 (emphasis added); *see also id.* ("Consumer Accounts is an important metric because it demonstrates the scale of our Technology Platform and facilitates the generation, consumption and monetization of content.").

34.    Unbeknownst to Yorkville at the time, the Triller app did not have anywhere close to 450 million legitimate consumer accounts as of April 2024, and Triller Corp. and AGBA knew.

13

In fact, as Yorkville would later learn, Triller Corp. had for years *actively purchased bot accounts* to artificially increase reported consumer accounts and, in turn, inflate its valuation.

35.     Upon information and belief, AGBA representatives learned of this bot-purchasing schemein conducting due diligence with respect to the transactions contemplated by the Merger Agreement, and before Yorkville ever invested.   The purpose of this fraudulent scheme was to inflate company value, attract investor capital, and facilitate the planned merger.   The true number of monthly active users at or around this time was actually a fraction of the 450 million consumer account figure represented to Yorkville.

36.     In preparation for the anticipated merger, Triller Corp. and AGBA turned to Yorkville as a source of interim financing.   Yorkville was a logical target for Triller Corp. and AGBA, given that Yorkville had previously entered into the Original SEPA when Triller Corp. was contemplating an IPO as a standalone company.

37.     Yorkville also was enticed to invest by Mr. Diamond's appointment as Chairman of the AGBA Board in September 2023.   Mr. Diamond's decades-long career in global finance—including his tenure as CEO of Barclays PLC, his senior leadership roles at Credit Suisse First Boston and Morgan Stanley, and his founding of Atlas Merchant Capital ("Atlas")—conferred significant credibility on the Triller Group enterprise.   When AGBA publicly announced Mr. Diamond's appointment at the time, it touted his "decades of financial services experience, an established leadership track record, as well as deep credibility in global finance to the Board," and that his addition would "accelerate the implementation of [the company's] strategic vision, setting the stage for long-term success."[4]   Mr. Diamond himself stated publicly that he was "thrilled to be

---

[4]    *See*    https://www.agba.com/company/newsroom/media-release/agba-group-appoints-bob-diamond-as-chairman-and-announces-atlas-merchant-capital-as-strategic-advisor/.

14

working with Wing-Fai and AGBA" and "look[ed] forward to our companies growing, working and investing together."  To induce Yorkville to invest, Mr. Ng and Mr. Diamond routinely told Yorkville how long they had known each other—more than 30 years—and what amazing friends and business colleagues they were.

38.     In reality, however, Mr. Diamond was not exercising the oversight and governance functions that his chairmanship was meant to provide—and that Yorkville reasonably expected. As Mr. Diamond himself later alleged in his own lawsuit against Triller Group filed in January 2025, the company "routinely excluded Mr. Diamond from accessing critical information necessary to discharge his duties properly."  And in his December 2024 resignation letter, Mr. Diamond admitted that "numerous significant Company events and actions seemingly proceeded with no meaningful Board reporting or review at all, including decisions as to key executive management positions, filings with the SEC, capital raising activities and other critical matters that warrant significant Board level review, deliberation and approval."  Mr. Diamond never disclosed any of these concerns to Yorkville prior to or during Yorkville's investment and instead actively concealed them by telling Yorkville that he was actively involved in the daily oversight of the Company.

39.     Mr. Diamond's silence to the market was itself misleading.  By continuing to serve as Chairman and allowing his name and reputation to be associated with Triller Group's public filings, investor presentations, and capital-raising activities—without disclosing that he was being systematically excluded from the company's governance—Mr. Diamond knowingly or at least recklessly created and perpetuated a false impression that Triller Group was subject to competent, independent board oversight.  This false impression was material to Yorkville's investment decision and its assessment of the risks associated with the Note.

40.     Yorkville understood Mr. Diamond's chairmanship as a signal that AGBA (and, later, Triller Group) would be under the direction of a seasoned and credible financial leader who would exercise meaningful oversight over Triller Group's operations, finances, and public disclosures.  Mr. Diamond knew that Yorkville was relying on Mr. Diamond's involvement in deciding to proceed with its investment.  Yorkville would not have funded the advances under the Note, or would not have done so on the same terms, had it known that Mr. Diamond was not in fact fulfilling that role.  Yorkville made this clear to AGBA and Triller Corp. before deciding to invest.

41.     On or about April 18, 2024, during discussions with AGBA and Triller Corp. representatives about a potential investment, Yorkville was presented with the Investor Presentation, which highlighted Triller Corp.'s impressive user/account metrics—in particular, the Triller app's purported "450 million consumer accounts" and "200B+" social media reactions.  *See* Exh. 2, Investor Presentation at 11 & 12.  During direct meetings in April and May 2024 with representatives of Triller Corp. and AGBA, Yorkville specifically raised questions about the accuracy of user/account figures set forth in the Investor Presentation.  Both Triller Corp. and AGBA stood by the accuracy of the figures, and at no point did they disclose the ongoing bot-purchasing scheme to artificially inflate those figures.

42.     On or about April 25, 2024, Triller Corp. and Yorkville executed an Amended and Restated Standby Equity Purchase Agreement (the "First A&R SEPA"), which reaffirmed the $500 million facility reflected in the Original SEPA and added AGBA as a party.  Mr. Ng signed the First A&R SEPA.  That same day, Yorkville funded a First Pre-Paid Advance of $8.51 million, which Triller Corp. agreed to repay under a Secured Convertible Promissory Note, also signed by

Mr. Ng.  AGBA also guaranteed repayment of the First Pre-Paid Advance under a Guaranty Agreement executed simultaneously therewith.

43.     Not long after execution of the First A&R SEPA and the funding of the First Pre-Paid Advance, Triller Corp. and AGBA approached Yorkville with a proposal to fund a second advance of $25 million.  The purpose of that advance was to continue to fund operations while efforts to close the merger remained ongoing.

44.     Shortly thereafter, the President of Yorkville, Mark Angelo, and Mr. Ng attended two separate events in which they discussed this proposed bridge financing.  On or around May 13, 2024, they had dinner at Cucina Alba in New York, New York.  At that dinner, Mr. Ng informed Mr. Angelo that Mr. Tsai had agreed to anchor a $500 million Reg 144A raise with a firm commitment of $100 million through his personal family office so that Triller Group would be well capitalized.  At that dinner, Mr. Ng boasted that Mr. Tsai was so wealthy that $100 million was a "rounding error" for him.  Mr. Angelo specifically asked Mr. Ng to confirm that the representations made in the public filings concerning Triller's active users and account holders were accurate and told Mr. Ng that it was critical to Yorkville's investment decision.  Mr. Ng confirmed that they were.  Mr. Angelo further advised Mr. Ng that Yorkville would only consider the additional investment if Mr. Tsai had firmly committed to anchor the $500 million raise with a personal family office investment of $100 million.  A few weeks later, on or about May 23, 2024, Mr. Angelo and Mr. Ng attended another meeting at the New York offices of DLA Piper LLP (US) wherein Mr. Ng reiterated Mr. Tsai's firm commitment to further invest in Triller Group.  Once again, Yorkville representatives at that meeting questioned Mr. Ng as to whether he had been able to verify the accuracy of the daily and monthly active users that AGBA had publicly disclosed in its SEC filings.  Mr. Ng confirmed that they had verified that the users were "real" and "not bots."

17

Throughout April and May, Yorkville spoke with Mr. Diamond on multiple occasions and Mr. Diamond also confirmed that the user numbers that AGBA reported publicly were correct and had been verified.

45.     On June 11, 2024, the investment banker engaged by AGBA to place the 144A offering invited Yorkville representatives, including Mark Angelo, to Mr. Diamond's offices at Atlas at 477 Madison Avenue in New York, New York.  Mr. Diamond and Mr. Ng both attended that meeting.  At that meeting, both Mr. Ng and Mr. Diamond repeatedly assured Yorkville that Mr. Tsai's family office's commitment of $100 million had already been secured.  This was critical because Yorkville would not have made an additional investment of $25 million without knowing that there was a firm commitment in place to fund Triller once the merger was completed.  The representation as to Mr. Tsai's commitment not only guaranteed that Triller would have $100 million available to fund its operations, but Tsai's positioning as an anchor investor greatly increased the likelihood that the full raise of $500 million would be successful.

46.     On or about June 27, 2024, the Yorkville Investment Committee formally met to discuss the proposal.  The Investment Committee's assessment of Triller Group was memorialized in an internal memorandum (the "Investor Committee Memo").  Relying on Triller Group's public filings and statements, Yorkville's communications with Defendants, and other due diligence conducted into Triller Group, Yorkville valued the company at $4 billion based in substantial part on its "436 million consumer accounts[.]" Exh. 3, Investor Committee Memo at 3, 4.  The Investor Committee Memo made no mention of any potential inflation of account numbers.  To this point, Triller Corp. and AGBA, including Mr. Ng and Mr. Diamond had repeatedly denied any issue with bots and other fictitious accounts.

18

47.     The Investment Committee also considered Mr. Tsai's firm commitment to further invest in Triller Group through his company Fubon, just as Mr. Ng had informed Mr. Angelo he would.  The June 27, 2024 Investor Committee Memo affirmed Mr. Tsai's firm commitment to "subscribe for ~20% of subsequent equity offerings and, with a $300-500mm offering planned post-merger[.]"  Exh. 3, Investor Committee Memo at 8.

48.     Following Yorkville's review of the figures and financials presented by Triller Group—during which no concerns were raised about the accuracy of the reported user metrics—Yorkville decided to proceed with a further investment by way of a convertible promissory note.

49.     Based on its extensive due diligence, the involvement of Mr. Diamond, the confirmed agreement by Mr. Tsai to invest $100 million and in reliance on the representations made by Triller Corp. and AGBA concerning Triller Corp.'s user metrics, Yorkville executed a Second Amended and Restated Standby Equity Purchase Agreement dated as of June 28, 2024 (the "Second A&R SEPA"), with AGBA and Triller Corp. as counterparties.  *See* Exh. 4, Second A&R SEPA.  Mr. Ng signed the Second A&R SEPA.  *Id.*

50.     The Second A&R SEPA contained an express representation by AGBA that its prior filings with the SEC—including the amended registration statement filed in January 2024—"do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading."  *Id.* § 5.05; *see id.* at 8-9 (definition of "SEC Documents").  That representation was false and misleading at the time it was made because, as already noted, AGBA's April 18, 2024 current report on SEC Form 8-K failed to disclose the ongoing scheme to falsely inflate Triller Corp.'s user and account metrics through a bot-purchasing scheme.

51.     Under the Second A&R SEPA, Yorkville agreed to advance another $25 million cash to AGBA and Triller Corp., on top of the more than $8.5 million previously advanced (but which remained unpaid at the time).  *See* Exh. 4, Second A&R SEPA §§ 2.02-2.03.  Yorkville funded this second $25 million advance the same day, and AGBA's obligation to repay the two advances was memorialized in the Note.  *See* Exh. 1, Note.  Mr. Ng signed the Note.  *Id.*

52.     As an inducement to assure Yorkville that its investment was secure, AGBA and Triller Corp. affiliate Triller Hold Co LLC ("Triller LLC") granted Yorkville security interests in certain assets pursuant to Pledge Agreements executed the same day.  *See* Exh. 1, Note §§ 14(a), 14(k), 14(cc), 14(kk); *see id.* at 2 (noting that obligations under the Note are "secured by [AGBA] and Triller LLC").

53.     In addition, and to give Yorkville even further comfort that its significant investment was secure, Convoy—with Mr. Tsai's authorization and approval—executed a Guaranty Agreement under which Convoy unconditionally guaranteed AGBA's obligations under the Note.  Exh. 5, Convoy Guaranty.  Triller Corp. and Triller LLC also simultaneously executed a substantially identical Guaranty Agreement.  Exh. 6, Triller Guaranty.

54.     Despite all of these assurances, Yorkville's $33.5 million investment was far from secure—as Yorkville would soon learn.

**C.     Relevant Terms of the Note**

55.     The outside Maturity Date under the Note was designated as June 28, 2025, meaning that payment of all outstanding Principal and other amounts due under the Note was due by that date.  Exh. 1, Note § 1(a).

56.     In addition to cash repayment, the Note also granted Yorkville "the option of converting on one or more occasions all or part of the then outstanding balance under this Note by delivering to the Company one or more Conversion Notices in accordance with Section 3."  *Id.*

20

at 2. Yorkville's right "to convert, on one or more occasions all or part of the Note in accordance with Section (3)" expressly survives the occurrence of an Event of Default and remains extant for so long as any portion of the Note remains outstanding after the Maturity Date. *Id.* § (2)(b). In other words, regardless of whether amounts due under the Note are accelerated by virtue of an Event of Default or remain outstanding after the Maturity Date passes, Yorkville retains its conversion rights under Section 3 of the Note.

57. Under Section 3(a) of the Note, Yorkville is "entitled to convert any portion of the outstanding and unpaid Principal, Interest, or other amounts outstanding under this Note into fully paid and nonassessable Common Shares at" a specified "Conversion Price." Exh. 1, Note § 3(a). To exercise its right "[t]o convert any Conversion Amount into Common Shares on any date," Yorkville must deliver a "Conversion Notice" to "the Company" (as of June 28, 2024, AGBA, but after the merger closing, Triller Group) by "11:59 p.m., New York time, on such date[.]" *Id.* § 3(b)(i). The "Company" then must "credit such aggregate number of Common Shares to which [Yorkville] shall be entitled" and must do so "on or before the third (3rd) Trading Day" following delivery of the Conversion Notice. *Id.*; *see id.* § 14(nn) (definition of "Trading Day"). The Note further provides that the Company's failure at any time "to deliver the required number of Common Shares to [Yorkville] within (1) Trading Day after the applicable Share Delivery Date" is an Event of Default. *Id.* § (2)(a)(vii).

58. The Note also describes certain instances where Triller Group "is obligated to cause its legal counsel to deliver legal opinions to [Triller Group's] transfer agent" when shares involve certain transfer restrictions. *Id.* § (3)(d)(vi). One such instance is where requested shares are subject to "legends restricting the transfer thereof." *Id.* If a required "legal opinion is not provided (either timely or at all)" by the Company, that is another Event of Default under the Note. *Id.*

21

59.     Under Section 3(d)(v) of the Note, AGBA/Triller Group agreed that "[Yorkville] shall have the right to pursue all remedies available to it at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief, in each case without the need to post a bond or provide other security." *Id.* § 3(d)(v).  That is, Triller Group acknowledges that Yorkville has the right to pursue injunctive relief, in the form of a decree of specific performance, to vindicate Yorkville's conversion rights and enforce Triller Group's obligations under Section 3 of the Note.

**D.     The AGBA-Triller Corp. Merger Closes, Triller Group's Fraudulent Scheme Is Revealed, and Yorkville Declares Multiple Events of Default Under the Note**

60.     The transactions contemplated by the Merger Agreement ultimately closed on October 15, 2024.  After the closing of the merger, AGBA was rebranded as Triller Group and, the next morning, began trading on Nasdaq under the ticker symbol ILLR.

61.     In stark contrast to the $4 billion valuation proclaimed by AGBA and Triller Corp. just months earlier, Triller Group's stock closed the first day of trading at approximately $4.33 per share, implying market capitalization of just ***$671 million***.  The next day, the price of Triller Group's common stock plummeted to $3.06 per share, a decrease of nearly ***30 percent***.

62.     Not even a month later, Defendants' fraudulent bot-purchasing scheme began to unravel.  On November 14, 2024, Mr. Angelo received a call from a Triller Group employee (the "Former Triller Employee").  On that call, the Former Triller Employee advised Mr. Angelo that Triller Group's publicly reported monthly active users (MAUs) and daily active users (DAUs) were grossly inflated through the intentional use of "bot farms," which are networks of automated, non-human accounts, typically operated from centralized server banks or clusters of devices, that are programmed to simulate real user activity such as account registrations, logins, and engagement in order to artificially inflate a platform's user metrics.

22

63.     The Former Triller Employee reported to Mr. Angelo that he had seen data showing that large numbers of users were located in North Africa and India and, further, that the phones were "not moving" and thus were very highly likely to be part of a "bot farm."

64.     As noted above, user metrics (consumer accounts, MAUs, DAUs) are among the most critical value indicators for social media companies because they signal genuine audience size, engagement, advertising potential, and investor confidence.  By incorporating millions of fictitious bot accounts without disclosure, Triller Group presented a fundamentally distorted picture of the app's actual reach and commercial viability.  Yorkville is a sophisticated, reasonable investor, and it considered it material that a significant portion of the reported user base was automated accounts purchased by the company itself.  This material omission was particularly egregious because Triller Group had repeatedly and publicly denied allegations of inflated user metrics, actively reinforcing the false impression.

65.     Mr. Angelo was shocked.  Mr. Angelo told the Former Triller Employee that, before Yorkville decided to invest in Triller Corp./AGBA, he and others at Yorkville had raised questions about Triller Corp.'s user metrics directly with Mr. Ng (in person and by telephone) and Mr. Diamond, (by telephone) who denied the allegations and assured him that AGBA had done due diligence on this issue and that the user numbers were accurately reported in AGBA's public filings.  The Former Triller Employee re-confirmed that the publicly reported user numbers, including those referenced in the Investor Presentation that Yorkville relied upon in making its investment, were greatly overstated and not reflective of the actual number of users.  The Former Triller Employee stated that he believed Triller Group was going to terminate his employment because he had raised concerns about securities violations with members of Triller Group's Board.

23

66.     After Mr. Angelo's call with the Former Triller Employee, Mr. Angelo immediately called Mr. Diamond and relayed the conversation he had just had.  On that call, Mr. Diamond did not deny that the user numbers were grossly overstated, thereby reinforcing the deception.  Mr. Angelo reiterated to Mr. Diamond that Yorkville would not have made its investment in Triller Group but for Mr. Diamond's confirmation and other similar statements by Triller Group that the user numbers stated in the public filings were accurate.

67.     Immediately upon learning this news, Yorkville prepared and delivered to Triller Group a notice of Event Default under the Note on the same day, identifying no fewer than six Events of Default and demanding immediate payment of all amounts then due—then calculated at $35,347,996.44—by no later than November 21, 2024.  Exh. 7, Default Notice.  Triller Group did not dispute the defaults but failed to pay.  As of the date of this Complaint, Triller Group has not paid any portion of the amounts outstanding under the Note, and that amount continues to grow daily at the agreed-upon default interest rate of 18 percent per annum.  *See* Exh. 1, Note § 1(b). To make matters worse, Triller has also refused to honor any of Yorkville's conversion notices.  It has essentially just stolen Yorkville's $33 million investment.  As noted, Yorkville has been pursuing a judgment with respect to Triller Group's defaults in the Payment Action pending in New York Supreme Court.

68.     Notwithstanding the substantial and growing amounts owed to Yorkville under the Note, Yorkville was forced to resort to self-help remedies to mitigate its damages.  On August 25, 2025, following notice to each Defendant, Yorkville conducted a public auction of its minority position in Bare Knuckle Fighting Championship ("BKFC") that Triller Group pledged as collateral.   Yorkville retained outside independent advisors to heavily market the auction,

24

including noticing Triller Group and its counsel. The auction closed with Yorkville placing a credit bid of $250,000 for the pledged BKFC shares.

69. This sale, however, satisfied only a small fraction of the amounts Triller Group owes to Yorkville under the Note. The $250,000 credit bid reduced the outstanding balance by a negligible sum relative to the $33.5 million in principle, along with interest and fees, that Triller Group fails and refuses to pay.

70. On November 15, 2024—*i.e.*, the very next day—**Triller Group notified the Former Triller Employee that he had been terminated**.

71. Mr. Ng played a central role in orchestrating the termination. On or about November 13 or 14, 2024, Mr. Ng convened a meeting of Triller's Board, at which Mr. Ng advocated for the termination. The Board did not engage in any vote regarding the decision to terminate for cause, and Mr. Ng pushed through the termination unilaterally without properly advising the Board or seeking the vote required under Triller Group's bylaws. Immediately following the Board meeting, on November 14, 2024, Mr. Diamond texted: "I am no longer an executive chair [of the Board], that is clear. For better and worse, this is the wing fai [Ng] show." Mr. Ng then coordinated with Triller's outside employment counsel to draft the termination letter, which was sent on November 15, 2024.

72. Just weeks later, on or around December 12, 2024, Mr. Diamond resigned as Chairman of the Board and director of Triller Group.

73. On January 7, 2025, Mr. Diamond filed his own lawsuit against Triller Group in this Court claiming that Triller "routinely excluded Mr. Diamond from accessing critical information necessary to discharge his duties properly." *Diamond v. Triller Group, Inc.*, No. 25-cv-129 (S.D.N.Y.) ECF No. 1, Compl. ¶ 15. Mr. Diamond further alleged that in his resignation

letter, he "expressed concern that in recent months 'numerous significant Company events and actions seemingly proceeded with no meaningful Board reporting or review at all, including decisions as to key executive management positions, filings with the SEC, capital raising activities *and other critical matters that warrant significant Board level review, deliberation and approval.*'" *Id.* ¶ 62.

74.    As noted above, Mr. Diamond's claims were entirely a surprise to Yorkville, as Mr. Diamond never gave Yorkville any indication that he was being shut out of key company decisions and actions.  Mr. Diamond's post-hoc claim that he somehow was not involved in company decision-making is nothing more than an attempt to evade liability for his own malfeasance and wrongdoing.  Mr. Diamond was consciously aware of or, at a minimum, recklessly disregarded, Triller Group's unlawful efforts to deceive investors, including Yorkville.

**E.    The Individual Defendants' Close, Years-Long Pre-Existing Relationship**

75.    Mr. Ng, Mr. Diamond, and Mr. Tsai had known one another and worked together for decades, forging a close and trusted relationship between them as of 2023 and beyond when the fraud described herein occurred.

76.    Mr. Diamond's appointment as Chairman of AGBA's Board was part of a long-standing and interlocking business relationship between Mr. Diamond and Mr. Ng.  In connection with the September 2023 announcement of his appointment, AGBA announced that Atlas, Mr. Diamond's firm, would serve as AGBA's strategic advisor.  Mr. Diamond publicly stated that he was "thrilled to be working with [Mr. Ng] and AGBA" and looked forward to "our companies growing, working and investing together."  Mr. Ng likewise stated that "Bob [others] . . . and [Mr. Ng] have known and worked with each other for decades" (*i.e.*, nearing as far back as 2003), that

26

it was "a privilege to be working with them again," and that "there is nothing in business better than working together with consummate professionals you know and trust."

77.    As Chairman of AGBA, Mr. Diamond was of course expected to serve the interests of its shareholders, including Mr. Tsai who had the ultimate controlling shareholder interest in the company (through other companies with Mr. Tsai controlled).  Upon information and belief, Mr. Diamond was aware that Mr. Tsai was AGBA's controlling stockholder and that Mr. Diamond's appointment, compensation, and continued tenure as Chairman depended on Mr. Tsai's support and approval.

78.    Mr. Tsai and Mr. Ng had worked together since at least as early as 2000.  Mr. Ng joined Fubon in 2000 as Group Managing Director, where he reported to the board and the founding Tsai family.  Mr. Tsai owns an approximate 13% stake in Fubon alongside his brother Daniel Tsai, with each such stake being valued at $1 billion in or around 2004 and increasing year-over-year since then.  Mr. Tsai has been Vice Chairman and then Chairman of Fubon's Board during that time period.  AGBA's corporate governance page confirms that Mr. Ng "represented and advised the Tsai family and Fubon Financial in its USD850 million strategic alliance with Citigroup in 2000," "orchestrated the International Bank of Asia acquisition in Hong Kong in 2004," and "led the winning bids to acquire Taipei Bank in Taiwan for $2.3 billion the following year."

79.    Mr. Tsai was also part of the AGBA and Triller Corp. merger, again, at a time when Mr. Diamond was AGBA's Chairman.  SEC merger-background disclosures state that Mr. Tsai was one of Triller Corp.'s major investors and that, during an April 24, 2023 meeting, Mr. Tsai suggested that Triller Corp. representatives speak with Mr. Ng about a public company in the financial services sector regarding a potential transaction.  Mr. Tsai's role in directing Triller Corp.

toward Mr. Ng and AGBA, combined with his later voting control over the combined company, further demonstrates that Mr. Tsai was involved in, and had access to information concerning, the merger process and the Triller Corp. user metrics that were central to the transaction's valuation.

**F.    Triller Group's Financial Condition Continues to Deteriorate in 2025 and 2026**

80.    Triller Group's financial condition has continued to degrade throughout 2025 and 2026, indicating that insolvency is imminent.  Indeed, a Form 10-Q filed with the SEC on November 14, 2024, signed by Mr. Ng on behalf of Triller Group, disclosed that "the prevailing conditions and ongoing liquidity risks encountered by [Triller Group] raise substantial doubt about the ability to continue as a going concern for at least one year."  Triller Group further "reported net loss of $28,849,026" for the first nine months of 2024, as well as a working capital deficit of over $40 million.

81.    On March 31, 2025, Triller Group filed a notification of late filing with the SEC on Form 12b-25, stating that it would be unable to timely file its 2024 annual report on Form 10-K without unreasonable effort or expense.  Invariably, a notification of late filing indicates a significant problem in the issuer's accounting that will require substantial time to resolve.

82.    By June 27, 2025, the last day of trading before the Note's Maturity Date, and with Triller Group still delinquent on its SEC filings, Triller Group's stock price had plummeted, closing at approximately $0.71.  That stock price implied a market capitalization of approximately $132 million, just a fraction of the sky-high valuation of $4 billion that Triller Group touted prior to the merger.

83.    The June 28, 2025 Maturity Date came and went, and Triller Group failed to pay the amounts outstanding under the Note.  Since that time, Triller Group's financial condition has continued to deteriorate, and Triller Group has faced significant legal challenges that severely threaten its ability to continue as a going concern.

84.    On October 14, 2025, Nasdaq sent Triller Group a delist determination letter indicating that its common stock would be subject to suspension and delisting for failure to timely file its 2024 Form 10-K and its Forms 10-Q for the first and second quarters of 2025.  On November 17, 2025, Triller Group received yet another delisting determination letter for failing to timely file its Form 10-Q for the third quarter of 2025.  On December 26, 2025, following a hearing, a Nasdaq panel confirmed the suspension of Triller Group's trading.

85.    Ultimately, Triller Group's failure to remain current on its SEC filings led Nasdaq to suspend trading in and delist Triller Group's stock as of December 30, 2025.  Although trading was restored on or about April 15, 2026 after Triller Group filed its overdue annual report, Nasdaq issued another delisting notice just two days later, on April 17, 2026, because Triller Group's stock price had been below the required $1.00 minimum bid price since at least the summer of 2025.

86.    Also, at the end of December 2025, a mere 18 months after Yorkville's investment, Triller Group shut down the once-vaunted Triller app, which was generating no revenue.  During a recent Triller Group Shareholder Q&A, Triller Group management explained that it shut down the app because "continuing to fund *a product without a sustainable revenue model* would have destroyed shareholder value."  Triller Group 6/29/26 8-K, Ex. 99.1 at 3 (emphasis added).  Not only was the revenue model unsustainable, but Triller Group had "*zero reported 2025* revenue from the social media and sports streaming segments[.]" *Id.* at 2 (emphasis added).  The Triller app shutdown confirms the absence of the level and type of *genuine* user engagement that had been the foundation of the $4 billion pro forma valuation that Defendants assigned to the combined company prior to the closing of the merger.

87.     Triller Group only became current with its SEC filings on April 14, 2026, when it filed its annual report on Form 10-K for 2025, signed by Mr. Ng, together with its 2024 Form 10-K and Forms 10-Q for the first three quarters of 2025.

88.     Those belated filings present a dire financial picture.  For example, Triller Group's 2025 Form 10-K—like several prior periodic filings—disclosed that Triller Group's independent auditor expressed "substantial doubt about the Company's ability to continue as a going concern for a period of twelve months from the date of issuance of" its 2025 year-end consolidated financial statements.  Triller Group 2025 Form 10-K at F-25.[5]  That determination was supported by the massive losses reported on Triller Group's income statement for calendar years 2024 and 2025, which were over *$1.1 billion* and *$174 million*, respectively.  *Id.* at F-6.

89.     Similarly, in its May 13, 2026 quarterly report filed on Form 10-Q for the first quarter of 2026, signed by Mr. Ng, Triller Group disclosed an approximate net loss of $32 million for the quarter, and $34 million assets against $382 million liabilities—a negative equity position of nearly $350 million.  Triller Group Q1 2026 10-Q at 1, 19.  As a result, Triller Group again reiterated that there existed "substantial doubt about the Company's ability to continue as a going concern for a period of twelve months[.]" *Id.* at 19.

90.     On February 17, 2026, Triller Group filed an amended Form 10-Q with the SEC, signed by Mr. Ng, disclosing that "currently available cash will not be able to provide sufficient funds to meet the planned obligations for the next 12 months," with a cash balance as of March 31, 2025 of only $2.1 million for working capital use.  Indeed, Triller Group's remaining cash would not cover even five months of the default interest accruing to Yorkville alone.

---

[5] Notably, Triller Group's prior independent auditor, WWC, P.C., announced its immediate resignation on January 28, 2026. *See* Triller Group 2/2/26 8-K.

91.     Music industry sources report that Triller Group owes approximately $30 million to various record labels, music publishers, and performing rights organizations.  At least one of those lawsuits appears to have recently resulted in a $3.2 million judgment.

92.     A lawsuit filed in April 2026 alleges that Triller Group has abandoned its wholly owned subsidiary, Flipps Media, Inc. ("Flipps"), which runs TrillerTV, including by refusing to provide funding necessary to prevent its insolvency.  *See Flipps Media, Inc. v. Triller Hold Co LLC*, No. 2026-0483 (Del. Ch.) (the "Flipps Action").  The Flipps directors all resigned in or about October 2024, and Triller Group allegedly abandoned Flipps by failing to nominate replacements or convene a stockholder meeting, forcing Flipps to obtain high-cost emergency debt facilities that led to insolvency.

93.     Further, recent public reporting indicates that Triller Group employees have not been paid in a year and have not received any communications from their bosses or the company generally in several months.[6]  Even before it cut employees' pay off entirely, Triller Group was failing to timely pay them.  The company also has apparently shut down employees' work emails and suspended their health insurance without notice or explanation.

94.     In addition to its financial woes, Triller Group faces hundreds of millions of dollars in liability exposure in various litigations pending against it; in each litigation, Triller Group is in default and is not actively defending the litigation:

        a.     In the Payment Action, Triller Group and the guarantors on the Note (*i.e.*, Convoy, Triller Corp., and Triller LLC) face liability of approximately $40 million (and growing) and are currently in default, as their counsel of record has withdrawn due to the defendants' failure to pay legal fees.  In fact, two sets of counsel have withdrawn due to non-payment of legal bills, causing repeated substitutions, missed appearances, and stalled proceedings.  In violation of New York law and orders of the Court, Triller

---

[6] *See* https://www.businessinsider.com/startup-triller-ghosted-workers-now-staking-its-future-on-spacex-2026-6.

31

Group and the other defendants have not been represented by counsel in the Payment Action since January 2026. On February 27, 2026, the court held a hearing on Yorkville's motion for summary judgment, and neither counsel nor any representative for the defendants appeared at the hearing or otherwise contacted the court or opposing counsel.[7] Yorkville's motion for summary judgment remains pending.

b.  In an action filed on August 27, 2025 by Triller Corp.'s former CEO, Bobby Sarnevesht, in the Delaware Court of Chancery (the "Sarnevesht Action"), Triller Group faces ***hundreds of millions of dollars*** in liability in connection with Triller Group's failure to register tens of millions of shares of common stock or use best efforts to secure a $500 million post-merger investment, in breach of express terms of the Merger Agreement. *See generally Sarnevesht v. Triller Group, Inc.*, No. 2025-0979-LWW (Del. Ch.), Compl. Triller Group failed to appear and defend the lawsuit and, as a result, a default judgment as to liability was entered against it on February 9, 2026. An evidentiary hearing on damages was held on May 11, 2026, and no one appeared on behalf of Triller Group. According to a post-hearing brief submitted by the plaintiff, Triller Group faces a potential money judgment ranging between ***$285 million and $379.6 million***, plus pre-judgment and post-judgment interest. On July 2, 2026, the court awarded Mr. Sarnevesht approximately $30 million, which he promptly appealed.

c.  Triller Group and Mr. Ng also have been sued by an executive who signed an employment agreement in September 2024 to serve as AGBA's (and, post-merger-closing, Triller Group's) CEO, in this Court. *See McGurn v. Triller Group, Inc., et al.*, No. 25-cv-5526 (S.D.N.Y.). He alleges that he was wrongfully terminated from his position on November 15, 2024—just two months into his employment—in retaliation for his blowing the whistle on potential federal securities violations arising out of a presentation widely disseminated to AGBA investors prior to the closing of the merger that falsely and misleadingly represented that certain individuals had been hired by the company as part of the senior executive team when, in truth, they had not. Both Triller Group and Mr. Ng failed to appear, and a default judgment was entered against them on May 29, 2026. On July 8, 2026, the executive submitted proposed findings of fact and conclusions of law seeking a judgment of approximately ***$33 million***, plus prejudgment and post-judgment interest.

---

[7] In a press release issued on June 10, 2026, Triller Group and Mr. Ng falsely stated that Triller Group was defending the Payment Action "vigorously." *See* https://www.globenewswire.com/news-release/2026/06/10/3309844/0/en/triller-group-inc-provides-clarification-regarding-yorkville-advisors-following-stockholder-questions-at-annual-general-meeting.html.

**G.    Triller Group Effectuates a 1-for-10 Reverse Stock Split to Maintain Its Nasdaq Listing, and Yorkville Delivers a Valid Conversion Notice That Triller Group Ignores**

95.    On or about June 25, 2026, Triller Group effectuated a 1-for-10 reverse stock split that it expressly admitted was intended "to support the Company's continued Nasdaq listing requirements"—namely, the required $1 minimum share price—given the extremely depressed prices at which its stock was trading at the time.  Triller Group 6/29/26 8-K, Exh. 99.1 at 4; *see id.* at 2.  Just prior to the split, Triller Group's common stock was trading at less than ***one dollar*** per share.

96.    Shortly thereafter, Triller Group's stock closed at $3.05 per share on significant trading volume, and Yorkville delivered the June 25 Conversion Notice in accordance with the terms of the Note, requesting that Triller Group: (i) deliver the required Rule 144 Opinion to its transfer agent, Continental Stock Transfer; and (ii) following issuance of the Rule 144 Opinion, instruct the transfer agent to issue the shares to Yorkville through its broker-dealer.  Exh. 8, June 25 Conversion Notice.

97.    Under section 3(d)(vi) of the Note, Triller Group "is obligated to cause its legal counsel to deliver legal opinions to the Company's transfer agent in connection with" the removal of any legend "restricting the transfer" of the conversion shares (i.e., the Rule 144 Opinion).  Exh. 1, Note § 3(d)(vi).  In addition, Triller Group is required, under section 3(b)(i) of the Note, to effectuate the transfer of the shares requested in the Conversion Notice with three Trading Days of receipt of the Conversion Notice.  *Id.* § 3(b)(i).  Triller Group therefore was required to issue the Rule 144 Opinion and effectuate the transfer of shares requested in the June 25 Conversion Notice by no later than June 30, 2026.

98.    Triller Group has refused to honor its obligations under the Note and, in a familiar pattern, simply ignored the June 25 Conversion Notice and did not respond to it at all.

99. On June 29, 2026, Yorkville contacted counsel for the Company and demanded that its June 25 Conversion Notice be honored by June 30, 2026. Yorkville received no response.

100. This case calls out for injunctive relief. Triller Group is a sinking ship, and its refusal to honor its clear and incontrovertible obligations under the Note have caused, and are continuing to cause, irreparable harm to Yorkville. Triller Group's imminent collapse threatens Yorkville's ability to recoup any of its $33.5 million investment and is preventing Yorkville from exercising valuable rights as a Triller Group stockholder.

101. In addition, the balance of equities strongly favors Yorkville. Triller Group has repeatedly and intentionally violated the law and flouted the legal process. As a matter of justice and fairness, this Court's intervention is required to address Triller Group's unjustifiable recalcitrance and thumbing of its nose at the investors who have funded its fraudulent and illegitimate business enterprise.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)
### (Against Defendant Triller Group)

102. Plaintiff incorporates and realleges in this paragraph all allegations set out in paragraphs 1-101.

103. The Note is a "security" and Yorkville's funding of the advances under the Note constituted the purchase of a security, in connection with which the misrepresentations alleged below were made.

104. In connection with the Note, Triller Group made materially false and misleading statements of material fact. In particular, in the Investor Presentation that Triller Group filed with the SEC on or about April 18, 2024 as an exhibit to its Form 8-K, and that Triller Group separately presented to Yorkville during the financing discussions described above, Triller Group represented

that the Triller app had over 450 million consumer accounts and, based on that and related usage metrics, projected a post-merger valuation of approximately $4 billion.  Triller Group further falsely represented that Richard Tsai had firmly committed to anchor a $500 million Rule 144A offering with a $100 million investment from his personal family office.

105.    Each of these statements was materially false and misleading when made.  Upon information and belief, the Triller app did not have over 450 million genuine consumer accounts at the time; instead, it had purchased bot accounts—automated, fictitious user profiles—to artificially inflate its reported account totals, rendering both the represented user base and the $4 billion valuation derived from it materially overstated.  In reality, the true number of monthly active users was a fraction of the 450 million consumer account figure represented to Yorkville. The magnitude of such an overstatement was plainly material to any reasonable investor.  Upon information and belief, Mr. Tsai also did not intend to honor his firm commitment to fund a $100 million investment, which was also plainly material to any reasonable investor because Triller needed that capital to fully fund its operations.

106.    Triller Group made these statements with scienter—with knowledge of their falsity or with reckless disregard for their truth or falsity.  This is established by, among other things, the company's deliberate purchase of bot accounts to inflate its metrics and the enormous disparity between the represented figures (450 million consumer accounts) and the actual figures (only a small fraction of 450 million), which was so extreme that Triller Group's senior leadership must have been aware of or, at a minimum, recklessly disregarded the misrepresentation.

107.    Yorkville justifiably and reasonably relied on Triller Group's misrepresentations by executing the Note and funding the advances in part as a result of Triller Group's reported figures and anticipated valuation, and Mr. Tsai's firm commitment to fund a $100 million

35

investment. Yorkville would not have done so, or would not have done so on the same terms, had it known the truth.

108. Yorkville suffered economic loss as a proximate result of Triller Group's misrepresentations. In reliance on the misrepresented user metrics and inflated valuation and purported firm $100 million investment commitment from Mr. Tsai, Yorkville funded $33,510,000 in advances under the Note. As the truth about Triller Group's fraudulently inflated user base and the investment-related misrepresentation was revealed, including through a series of corrective disclosures and events, the value of Yorkville's investment declined and has been substantially impaired. The entire principal balance of $33,510,000 remains unpaid, and that amount has since increased and continues accruing at a rate of $16,525.48 per day as established under the Note.

109. In light of the foregoing, Triller Group violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in making untrue statements of material fact, and by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in connection with Yorkville's purchase of the Note.

110. As a direct and proximate result of Triller Group's violations, Plaintiff has suffered economic loss and damages in an amount to be proven at trial.

## COUNT II

**Violation of Section 10(b) of the Exchange Act and SEC Rules 10b-5(a) and (c)**
**(Against All Defendants)**

111. Plaintiff incorporates and realleges in this paragraph all allegations set out in paragraphs 1-101.

36

112. Defendants, individually and in concert with one another, knowingly or recklessly employed devices, schemes, and artifices to defraud, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Yorkville in connection with its purchase of the Note.

113. Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on Yorkville.

114. The scheme to defraud consisted of deceptive conduct that went beyond any single misstatement. Among other things, Triller Group purchased "bot" accounts, and knowingly permitted bot, duplicate, and other fictitious accounts to remain active on the Triller app, in order to artificially inflate the Triller app's reported figures and the company's purported valuation.

115. Defendants then disseminated, and caused to be disseminated, the Investor Presentation and related materials reflecting these artificially inflated figures to Yorkville and the investing public, while knowing, or recklessly disregarding, that the figures were the product of the deceptive conduct described above and did not reflect the Triller app's genuine user base.

116. In addition to the fraudulent bot-account scheme, Mr. Ng and Mr. Diamond further induced Yorkville's continued investment by representing that Mr. Tsai had personally committed, through his family office, $100 million to anchor a $500 million capital raise for Triller Group, and later that this commitment had already been secured. Yorkville conditioned its additional $25 million investment on confirmation of Mr. Tsai's firm commitment, and Defendants knew that Yorkville was relying on these representations in deciding to proceed. Despite these repeated

37

assurances, no such $100 million investment or $500 million capital raise has ever been disclosed to have materialized, and Triller Group has instead continued to suffer severe and worsening liquidity crises, including recurring going-concern doubts and an inability to satisfy its obligations, further evidencing that Defendants' representations concerning Mr. Tsai's commitment were part of the same scheme to defraud Yorkville into investing in a company whose true financial condition and prospects were being concealed.

117.    Each Defendant knowingly or recklessly participated in, directed, and substantially furthered the scheme.  Mr. Ng, as chief executive officer of Triller Group, knew that the Triller app's reported user data was false and misleading and that Triller Group had engaged in a scheme to inflate its reported user numbers through the purchase of "bot" and other fictitious accounts, which Triller Group allowed to remain on the platform in order to artificially inflate the company's numbers.  Mr. Diamond, as chairman of the Triller Group Board, and Mr. Tsai, as Triller Group's controlling stockholder, directed, approved, and furthered the deceptive conduct and the dissemination of the inflated figures.  Further, Mr. Tsai, through Convoy, enticed and encouraged Yorkville to invest tens of millions of dollars in the company in causing Convoy to execute the Convoy Guaranty.  Mr. Ng and Mr. Diamond further directed and substantially furthered the scheme by repeatedly representing to Yorkville, both before and after Yorkville's initial advance, that Mr. Tsai had personally committed, and later had secured, a $100 million investment through his family office to anchor a $500 million capital raise for Triller Group, and Mr. Tsai, as the subject and beneficiary of those representations and as Triller Group's controlling stockholder, knew of, authorized, or recklessly permitted those representations to be made without correction.

118.    Defendants engaged in the foregoing conduct with scienter, that is, with the intent to deceive, manipulate, or defraud, or with reckless disregard for the truth.

119.    Triller Group's termination of the Former Triller Employee on November 15, 2024—the very next day after the Former Triller Employee informed Yorkville of Defendants' fraudulent conduct—is evidence of Defendants' consciousness of wrongdoing.

120.    Yorkville justifiably and reasonably relied on Defendants' deceptive conduct and on the integrity of the figures and valuation that were the product of the scheme and would not have executed the Note or funded the advances, or would not have done so on the same terms, absent that conduct.

121.    As a direct and proximate result of Defendants' violations, Yorkville has suffered economic loss and damages in an amount to be proven at trial.  As set forth in detail above, the truth about the Triller app's fraudulently inflated user metrics was revealed through a series of corrective disclosures and events—including Triller Group's disastrous initial public trading, Mr. Diamond's admission, the Former Triller Employee, and Triller Group's subsequent financial deterioration and complete shuttering of the Triller app.  Ultimately, Triller Group failed to repay any portion of the $33,510,000 principal balance under the Note.  Had Yorkville been aware of Triller Group's undisclosed fraudulent scheme, it never would have agreed to invest in the company in the first place.

122.    As a direct and proximate result of Defendants' violations, Yorkville has suffered economic loss and damages in an amount to be proven at trial.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

123.    Plaintiff incorporates and realleges in this paragraph all allegations set out in paragraphs 1-101.

124. As alleged in Counts One and Two, Triller Group committed primary violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. The Individual Defendants, by virtue of their respective positions as CEO, Chairman, and controlling stockholder of Triller Group, had the power and authority to, and did, control Triller Group, including the power to control specific corporate actions and statements that give rise to the primary violations alleged herein.

126. The Individual Defendants also were culpable participants in Triller Group's fraudulent scheme. Mr. Ng and Mr. Diamond participated directly in discussions with Yorkville representatives in which they perpetuated Triller Group's false and misleading statements concerning the accuracy and legitimacy of its user data, and Mr. Tsai, through Convoy, enticed and encouraged Yorkville to invest tens of millions of dollars in the company in causing Convoy to execute the Convoy Guaranty. In addition, Mr. Ng and Mr. Diamond directly and repeatedly represented to Yorkville that Mr. Tsai's family office had committed to, and later had secured, a $100 million investment to anchor a $500 million capital raise for Triller Group—representations concerning Mr. Tsai's own commitments that Mr. Tsai knew were being made to induce Yorkville's continued investment and that he did not correct despite knowing, or recklessly disregarding, that they were false or misleading.

127. Consequently, each of the Individual Defendants is liable as a controlling person of Triller Group under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

128. For the foregoing reasons, the Individual Defendants are liable, jointly and severally, with Triller Group and one another, to the same extent as Triller Group is liable for the primary violations alleged in Counts One and Two.

129.    As a direct and proximate result of the Individual Defendants' violations of Section 20(a), Yorkville has suffered economic loss and damages in an amount to be proven at trial.

## COUNT IV

**Breach of Contract – Specific Performance**
**(Against Defendant Triller Group)**

130.    Plaintiff incorporates and realleges in this paragraph all allegations set out in paragraphs 1-101.

131.    The Note is a valid, binding, and enforceable contract between Yorkville and Triller Group.

132.    Yorkville performed all of its obligations under the Note.

133.    Yorkville validly delivered the June 25 Conversion Notice in accordance with the terms of the Note.  Upon delivery of the June 25 Conversion Notice, Triller Group was required to credit to Yorkville the aggregate number of Common Shares to which Yorkville was entitled on or before the third (3rd) Trading Day following delivery of the Conversion Notice, and to cause its legal counsel to deliver the Rule 144 Opinion to Triller Group's transfer agent.

134.    Triller Group breached the Note by failing to deliver to Yorkville the Rule 144 Opinion or the shares of Triller Group common stock requested in the June 25 Conversion Notice on or before June 30, 2026.  As of the date of this Complaint, Triller Group still has not delivered the Rule 144 Opinion or the requested shares to Yorkville.

135.    Money damages are inadequate because Triller Group is insolvent or on the verge of insolvency and will be unable to satisfy a money judgment.

136.    Yorkville's purpose in seeking conversion is not to collect a debt but to obtain tradeable shares that it can sell on the open market while Triller Group stock still trades.

41

137. Yorkville's only meaningful recovery is to receive the Requested Shares while Triller Group stock continues to trade, so that Yorkville may sell those shares on the open market.

138. Specific performance is feasible. The shares exist, Triller Group's transfer agent remains operational, and the delivery mechanism (DWAC) is a routine administrative act.

139. In addition, Triller Group expressly agreed that Yorkville would be entitled to seek "a decree of specific performance and/or injunctive relief" to enforce Triller Group's obligations under section 3 of the Note, without the need to post a bond. Exh. 1, Note § 3(d)(v).

140. Yorkville is entitled to a decree of specific performance compelling Triller Group to immediately deliver the Rule 144 Opinion and the 32,569 shares of Triller Group common stock requested in the June 25 Conversion Notice.

## COUNT V

### Breach of Contract – Damages
### (Against Defendant Triller Group)

141. Plaintiff incorporates and realleges in this paragraph all allegations set out in paragraphs 1-101.

142. As set forth in Count IV above, the Note is a valid and binding contract, Yorkville performed all of its obligations under the Note, and Triller Group breached the Note in failing and refusing to carry out its obligations with respect to the June 25 Conversion Notice.

143. Under section 3(d)(v) of the Note, Triller Group acknowledged and agreed that Yorkville's exercise of its right to pursue specific performance and/or injunctive relief "shall not prohibit [Yorkville] from seeking to enforce damages pursuant to any Section hereof or under applicable law." Exh. 1, Note. § 3(d)(v).

144. In the event that the remedy of specific performance requested in Count IV is unavailable for any reason, Yorkville is entitled to an award of damages in an amount to be proven

at trial, which damages have been directly and proximately caused by Triller Group's breaches of the Note in connection with the June 25 Conversion Notice.

## PRAYER FOR RELIEF

WHEREFORE, Yorkville respectfully requests the following relief:

(a)     A judgment finding Defendants liable for the violations of the Exchange Act described herein and awarding equitable rescission of the Note or if, rescission is unavailable, rescissory and compensatory damages, in favor of Yorkville against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with prejudgment interest thereon;

(b)     A temporary restraining order, pursuant to Federal Rule of Civil Procedure 65(b), directing Triller Group to immediately and specifically perform its obligation under the Note to issue to its transfer agent, Continental Stock Transfer, the Rule 144 Opinion requested in the June 25 Conversion Notice;

(c)     A preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a), directing Triller Group: (i) to instruct its transfer agent, following issuance of the Rule 144 Opinion, to issue the shares requested in the June 25 Conversion Notice; and (ii) to comply with its obligations under the Note with respect to any future conversion notices validly delivered by Yorkville;

(d)     Upon final adjudication, a permanent injunction compelling Triller Group to deliver to Yorkville the Requested Shares and required legal opinion, and enjoining Defendants from further violations of the federal securities laws;

(e)     In the event that the remedy of specific performance or injunctive relief with respect to the June 25 Conversion Notice is unavailable, a judgment in favor of Yorkville against Triller Group awarding Yorkville damages, in an amount to be proven at trial, that have been directly and proximately caused by Triller Group's breaches of the Note in connection with the June 25 Conversion Notice;

(f)     An order awarding Plaintiff its reasonable attorneys' fees, costs, and disbursements incurred in this action, together with pre-judgment and post-judgment interest; and

(g)     Such other and further relief as this Court deems just, equitable, and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

43

Dated: New York, New York
      July 31, 2026

Respectfully submitted,

DLA PIPER LLP (US)

By:   */s/ Caryn G. Schechtman*
      Caryn G. Schechtman
      Steven M. Rosato
      Sarah N. Turner
      Jake K. Overlander

1251 Avenue of the Americas
New York, New York 10020
Tel: (212) 335-4500
caryn.schechtman@us.dlapiper.com
steven.rosato@us.dlapiper.com
sarah.n.turner@us.dlapiper.com
jake.overlander@us.dlapiper.com

*Attorneys for Plaintiff YA II PN, Ltd.*